UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

DEMITRIOS STRATAKOS,

                            Plaintiff,

    -against-


NASSAU COUNTY, POLICE OFFICER
PRASHANT RANE AND POLICE
OFFICER KARL PADILLA,

                          Defendants.

------------------------------------------------------------X

**FILED**
**CLERK**

6/24/2021 4:55 pm

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**BENCH TRIAL**
**<u>DECISION AND ORDER</u>**

CV 15-7244 (GRB)

**APPEARANCES:**

Ethan Daniel Irwin
Ethan D Irwin PLLC
165 Broadway, Ste 23rd Floor
New York, NY 10006

James M. Ingoglia
Steven Raiser
Raiser & Kenniff, P.C.
300 Old Country Road, Ste 351
Mineola, NY 11501
       *Attorneys for Plaintiff*

John Alexander Genua
Ralph J. Reissman
Scott J. Kreppein
Alexander Sendrowitz
Diane C. Petillo
Spencer David Shapiro
Nassau County District Attorney's Office
1 West Street
Mineola, NY 11501
       *Attorneys for Defendants*

**GARY R. BROWN, United States District Judge**

      On March 22 and 23, 2021, the Court held a virtual bench trial on consent in this

excessive force case using the Zoom video platform due to ongoing risks associated with the COVID-19 pandemic. During two full days of testimony, five witnesses testified, including the plaintiff, two defendant police officers, a medical expert and a law enforcement expert, and counsel offered numerous physical and electronic exhibits into evidence. The virtual format hindered neither counsel's presentation of the evidence nor the Court's assessment of credibility. Thus, despite the limitations of a virtual proceeding, the search for truth proved effective.

The evidence proved startling and the truth that emerged therefrom disturbing. Notwithstanding efforts by the two defendant police officers to coordinate and falsify testimony and sworn statements, the evidence demonstrated that those officers – acting contrary to well-established training and policies of the Nassau County Police Department – arrested the plaintiff without legal basis and that one officer viciously assaulted him, resulting in injury. That the motivation for this attack seems to have been merely to prevent plaintiff from contacting the officers' supervisor with a minor complaint against them renders the attack both malicious and unfathomable.

## BACKGROUND AND PROCEDURAL HISTORY

The procedural history of this matter is set forth in Judge Spatt's detailed and thorough summary judgment opinion in this matter, familiarity with which is assumed. *See Stratakos v. Nassau Cty.*, 2019 WL 6699817 (E.D.N.Y. Dec. 9, 2019). Judge Spatt's summary of the facts provided to the Court during that motion practice proves instructive:

> The following events culminated in the Plaintiff's arrest by Rane and Padilla, though the parties diverge in their description of those events. The Plaintiff alleges the following: (a) he was pacing on the sidewalk near Club Sugar, waiting for his friend to exit the nightclub, when he approached Rane and his squad car to

ask him a question; (b) Rane told him to "get the fuck away from the vehicle," and the Plaintiff complied by returning to the sidewalk; (c) he called 911 to request that a supervisor come to the nightclub, and he started recording his interactions with the police, using his cell phone; (d) Rane called the 911 dispatcher and told the dispatcher that there was no need to send a supervisor to the scene; (e) Rane approached the Plaintiff on the sidewalk and told him that if he did not leave the area, he would arrest him for trespassing; (f) the Plaintiff once again complied with Rane, leaving the area near Club Sugar; (g) while he was walking away from the club on a nearby street, he began calling the 911 dispatcher on his cell phone to ask why a supervisor was not sent, and he saw Rane and Padilla approaching him in their vehicles; (h) Rane struck the Plaintiff's hand that had been holding the cell phone with his baton, then used the baton to strike him in the head, without giving any prior warning, and even though the Plaintiff had made no effort to resist; and, (i) the attack rendered the Plaintiff unconscious; damaged his cell phone to the point that it was not recoverable; caused him to sustain several injuries, such as a laceration to his nose; and required him to go to the hospital. ECF 49 at 2–7.

The Defendants allege the following. The Plaintiff had attempted multiple times to re-enter Club Sugar. ECF 60-1 at 2. For nearly an hour between 3:15 am and 4:15 am, the police ordered the Plaintiff to leave the vicinity of the nightclub, but the Plaintiff did not leave, and instead, he repeatedly dialed 911. *Id.* at 3. They could not confirm that the Plaintiff had recorded them because he had failed to produce the cell phone used that night. *Id.* at 2. The Plaintiff was not walking away in order to comply with directions to leave, he was walking away from officers attempting to arrest him. *Id.* The officers had probable cause to believe that the Plaintiff was obstructing governmental administration under New York Penal Law § 195.05 by "refusing to comply with lawful directives, repeatedly dialing 911, and otherwise interfering with the police completing their duties at the scene." *Id.* at 2. They also argue that the Plaintiff misrepresents the deposition testimony of several individuals, such as that of Rane, who testified that he was not sure if he had struck the Plaintiff. *Id.* at 3.

2019 WL 6699817, at *2. In that decision, Judge Spatt determined that the following claims would proceed to trial against defendants Nassau County, Officer Prashant Rane and Police Officer Karl Padilla: "(1) the excessive force claim; (2) the First Amendment claim asserting a right to film the police; (3) the failure to intervene claim; (4) the assault and battery claim; and (5) the *respondeat superior* claim." *Id.*, 2019 WL 6699817, at *17. The fifth claim, *respondeat superior*, is the sole cause of action pending against the County; the other four were lodged

against the officers.

The evidence that emerged at trial differed significantly from that proffered to Judge Spatt.[1]  In fact, this variance has required reconsideration of certain claims previously dismissed, including false arrest, false imprisonment and malicious prosecution, as discussed further below.

## FINDINGS OF FACT

Evidence of the events surrounding the putative arrest and assault of plaintiff comes from a handful of unsatisfactory sources, each presenting significant limitations.  The eyewitness testimony of the plaintiff, though credible in the main, consisted largely of perceptions and memories skewed by intoxication.  This limitation explains some inconsistencies between his testimony and other demonstrable facts, logic and/or common sense.  At other times, however, the plaintiff appeared to shade his testimony, exaggerating or underemphasizing certain elements in a seeming attempt to help his case.

Any dissatisfaction with the plaintiff's testimony, however, pales in comparison with conduct of the two police officer defendants who testified in this case, which can only be described as shameful.  Riddled with both internal and mutual inconsistencies, the sworn testimony provided by the police officers vacillated before and even during trial.  The police officers openly admitted to perjurious conduct during the underlying state court criminal proceeding.  *See* Trial Transcript ("Tr.") 215-220 (Padilla, at Rane's direction, signed a sworn

---

[1] Summary judgment was not the only juncture during six years of litigation at which the Court was supplied with evidence that varied distinctly from that presented at trial. For example, in resolving the motions to dismiss, Judge Spatt quoted, in its entirety, the facts set forth against plaintiff in a criminal charging document allegedly witnessed and signed under oath by Officer Padilla. *See Stratakos v. Nassau Cty.*, 2016 WL 6902143, at *1 (E.D.N.Y. Nov. 23, 2016) (noting that "t]he charging documents, which were sworn to by PO Padilla . . . set forth [a] factual account in support of the [criminal charges]").  As discussed below, the trial evidence demonstrated that this account was fictitious, as Padilla, in fact, witnessed *none* of the critical matters set forth in the charging instrument.

statement in support of criminal complaint that was fabricated in all material respects).  Worse yet, the police officers were compelled to admit that they had engaged in a concerted effort in the criminal case, as well as deposition and trial[2] of this case, to "coordinate" their testimony. Tr. 290-94 (Rane and Padilla discussing Rane's trial testimony with counsel while Rane was still on the stand); Tr. 321-22 (evidence that Rane and Padilla discussed content of their testimony before criminal hearing and criminal trial in 2014); Tr. 324 (Rane and Padilla meeting to "resolve any discrepancies" in their recollections before deposition in this action). That counsel for the defendants facilitated such effort by, in each instance, preparing the officers to testify together, is troubling beyond words.

Other facts can be drawn about the night in question from the police communication recordings and transcripts thereof, admitted into evidence as Exhibit 2.  These audio recordings – frequently referred to as 911 tapes during trial – contain recordings of 911 calls, police radio transmissions and interdepartmental telephone calls.  The time sequence of these recordings can be difficult to identify: while the 911 calls generally have time stamps, the police radio communications are presented in a single file of recordings with the silences eliminated, rendering precise time identification impossible.  Nevertheless, these recordings captured critical, if sporadic, contemporaneous information.

By reconciling these sources of information, one can reasonably reconstruct the events of December 29, 2012.  It is not a pretty picture.[3]

In the early morning hours of December 29, 2012, plaintiff and a friend, referred to as

---

[2] To safeguard attorney-client communications, the Court did not permit counsel to inquire as to the precise content of the communications that occurred during trial.  But given the exceptional history here, the timing and nature of these discussions are extremely suspect.

[3] The facts of this case could well stand as a monument to the axiom, sometimes attributed to NFL Coach Nicholas Saban, that "Nothing good ever happened after midnight."

"Z," spent several hours drinking at the so-called "Sugar Club,"[4] a now-defunct entity located on Voice Road in Carle Place, New York, after having a several drinks at another establishment. Google Maps images, introduced during the course of the trial, demonstrate that the Sugar Club was nestled in a tremendous L-shaped strip mall, along with other retail and consumer establishments with a large parking lot.[5] This particular mall is found at the intersection of Voice Road and Glen Cove Road, less than a mile from the Roosevelt Field shopping center. Located on the west side of the mall, the entrance to the Sugar Club appears to be several hundred feet from Voice Road, and more than 1,000 feet from Glen Cove Road.

Plaintiff admitted to consuming a number of Long Island iced teas, an infamously powerful alcoholic concoction, and acknowledged being intoxicated during several 911 calls. Tr. 109 (plaintiff describes drinking that evening); Tr. 111 (plaintiff telling 911 operated that he was intoxicated); Ex. 2, Track 4 (same). Trouble began sometime around 2:50 a.m., when police were summoned to the Sugar Club to respond to a fire alarm at the establishment, which was later clarified as a fight during which someone triggered the fire alarm. Ex. 2, Track 1(initial report of fire alarm at 2:50 a.m.), Tr. 14 (fire official advising 911 that "there's a big fight there, and somebody who was in the fight decided to pull the fire alarm").

The plaintiff, then 24, represents the sole witness presented as to events prior to the arrival of the police. Plaintiff begins his account at approximately 3:05 a.m., at about which time, according to plaintiff, his friend Z reentered the club to use the restroom. Tr. 45. A few minutes later, the bouncers were escorting Z out of the club, and the plaintiff advises that,

---

[4] It seems that the full name of this short-lived entity was the "Sugar Dining Den & Social Club." One reviewer described the establishment as "Horrible," which seems fitting in the context of this case. *See Review of Sugar Dining Den & Social Club*, Tripadvisor, *https://www.tripadvisor.co.nz/ShowUserReviews-g47413-d1985903-r123660727-Sugar Dining Den & Social Club-Carle Place Long Island New York.html* (last visited June 23, 2021).
[5] Several such facilities are found in the vicinity of Carle Place.

though he was not inside at the time, "the fire alarm was pulled." *Id.* 46. "I was standing in front of the door when I heard the commotion," the plaintiff testified, "and the lead bouncer, the guy in the front, he hit me in the face with his hands to move me out of the way." *Id.*

At trial, Plaintiff tried to minimize this event, stressing that the bouncer had "pushed [his] face" and that "nothing" happened to him as a result of this contact. *Id.* 47, 117. At the time of the incident, however, plaintiff's account was different, as he repeatedly reported to a 911 operator that he had been "assaulted by a bouncer" and been "punched in the face like for no reason." Ex. 2, Tracks 4 & 10; Tr. 115-16. Indeed, plaintiff's initial pique with the officers seems to have emanated, in part, from their refusal to effect an arrest of the bouncer. *Id.* Plaintiff's description of being "pushed" in the face also conflicts with his prior testimony at deposition and a 50(h) hearing. The Court rejects this assertion and finds that he was punched in the face by a bouncer and misrepresented this fact at trial. At the same time, the undersigned finds that this contact with the bouncer did not result in the facial injuries sustained that night: had plaintiff had injuries requiring hospitalization in a fight with the bouncer before 3:00 a.m., it seems implausible that ninety minutes would have elapsed before he would have been taken to the hospital. Even Officer Rane could not recall any pre-arrest facial injuries. Tr. 259.

According to the plaintiff, he and Z then waited for the police to arrive because "the bouncers instructed [them] to do so." *Id.* 48. Rane, Padilla and other officers responded to the scene. Rane and Padilla positioned their cars immediately in front of the club, facing opposite directions and with their drivers' side windows close together. Plaintiff reports (though this immaterial fact is disputed) that Rane and Padilla took Z's identification. *Id.* According to plaintiff, approximately fifteen minutes later, he approached the police vehicles to inquire as to the progress of the situation. *Id.* 49. Plaintiff, who weighed approximately 300 pounds, sidled

up between the two cars, which were close together, and confronted Rane at his open driver's window. *Id.* Rane, apparently startled, yelled at plaintiff, telling him to "get the fuck away from the car." *Id.* 50. Plaintiff, incensed, either asked for Rane's badge number or tried to read his badge. *Id.* Rane, further annoyed, continued to yell at plaintiff and may have shaken his badge to keep plaintiff from being able to read it. Tr. 50, 269.

Plaintiff retreated from the car, immediately calling 911 at 3:12 a.m. to demand that a police supervisor be sent to the scene. Ex. 2, Track 4. Although he did not so testify, during that call he advised the 911 operator that Rane had threatened him with arrest. *Id.* The operator assured him that a supervisor would report to the scene. *Id.* Plaintiff persevered, continuing to make 911 calls, receiving repeated assurances that a supervisor was responding, and eventually being asked not to further tie up the 911 system. *Id.*, Track 6.

The officers were made aware of plaintiff's requests to 911 and to the precinct that a supervisor respond to the scene. Tr. 187-88. Unbeknownst to plaintiff, Rane interceded, effectively cancelling the request for a supervisor by advising the dispatcher, via radio, that the situation was under control and no supervisor was needed. Tr. 215; Ex. 2. Rane then took the extraordinary step of advising the 911 dispatcher to route all 911 calls related to this scene directly to him. Tr. 373-375; Ex. 2. Rane failed to offer a plausible explanation for these efforts. *Id.*

After making the first 911 call, plaintiff began using his cell phone to film the officers. Tr. 57. While plaintiff indicated an intent to "document everything," no testimony was elicited concerning any video recording that would have revealed relevant evidence.[6] Tr. 59. The

---

[6] Defendants' argument that the Court draw a negative inference from the failure to properly preserve the cell phone, therefore, proves unavailing, as no inference can be drawn that anything of value was on that device. The same can be said of plaintiff's arguments relating to the 911 tapes, as there is nothing from which the Court could divine that relevant evidence was not preserved or produced.

officers returned Z's identification documents, and Z found his way to plaintiff's car, where he likely went to sleep. *Id.* 60. At this point, Rane and Padilla moved their vehicles to the center of the parking lot, several hundred feet from the Club entrance. *Id.* 61. Plaintiff circumnavigated the parking lot, videorecording the officers' cars. *Id.* 62. Eventually, the lights went out in the lot, and plaintiff headed toward the street, walking onto Voice Road and eventually onto Glen Cove Road, switching his attention to calling the Third Precinct to follow up with a supervisor. *Id.* 56, 65.

At approximately 4:15 a.m., having learned that plaintiff was persisting in his efforts to contact a supervisor, Rane approached plaintiff, advising him that unless he left the area, they would arrest him for trespassing. *Id.* 66-7, 194, 274. Recognizing that he was drunk and should not drive, plaintiff began walking on Glen Cove Road, heading toward Roosevelt Field Mall, where he had keys to a store that he managed, where he could go to sleep. Because he was moving away from the parking lot, still under the impression that a supervisor was coming, he called the Third Precinct to arrange a meeting point. *Id.* 70.

Critically, as defendants acknowledged, while plaintiff's actions could readily be categorized as unusual, foolhardy or, in Officer Rane's opinion, obnoxious, he was not violating the law. *Id.* 189, 262-63, 314. In fact, Rane acknowledged that he lacked any basis even to ask the plaintiff to leave the area. *Id.* 263, 267 (plaintiff was not committing a crime when he approached Rane). Indeed, defendant Rane admitted that the only things that changed from the beginning of the events to the time of arrest were that the plaintiff had tried to contact his supervisor and videorecorded the officers. *Id.* 264.[7]

Nevertheless, at approximately 4:25 a.m., Rane and Padilla decided to place the plaintiff

---

[7] Rane may have been particularly sensitive to supervisorial intervention, having been previously subject of a civilian complaint that blossomed into civil litigation. Tr. 272.

under arrest. *Id.* 196, 199, 276. In response to questions from the Court, Rane seemed unable to articulate a coherent basis for this decision. *Id.* 384-85. The officers drove their cars across the parking lot to reach the plaintiff; that the plaintiff had moved over 1,000 feet away and was walking away from the club undermines any notion that he presented a continuing threat to the nightclub, which was closing. *Id.* 196, 203.

The Felony Complaint signed under oath by Padilla further demonstrates the fallacious and baseless nature of the arrest. Ex. 3. In that document, which charged plaintiff with Assault in the Second Degree, Padilla averred under oath to having observed plaintiff push Rane after the officer had "repeatedly ordered the defendant to leave the scene of the disturbance," and stated that "[plaintiff] then grabbed Officer Rane's arm and pulled him forward which caused substantial pain to his neck." *Id.* As Padilla admitted at trial, he witnessed no such thing, and as both defendants ultimately admitted, these events were largely fabricated. Tr. 217-18. [8]

When they reached plaintiff, Rane did not wait for Padilla to exit his car, but rather immediately engaged with the plaintiff; the entire interaction was so fast that Padilla was ten feet from the men when, suddenly, they hit the ground. *Id.* 204. Padilla described it as "very scary to see them both go down like that." *Id.* Yet it happened so quickly that Padilla was unable to describe what happened. *Id.* 206. That Rane opted to approach the plaintiff – who was large and drunk – without waiting for the assistance of a fellow officer only a few seconds behind him, belies any claim that Rane perceived plaintiff as a threat. *See* Ex. 9 at 7 (training officers that requesting assistance during arrest "might obviate the need for physical force"); Tr. 429-30 (testimony by law enforcement expert concerning how Rane squandered the

---

[8] Notably, before the second day of testimony began, the Court observed that the arrest had, apparently, been based upon fictitious charging documents, and that Judge Spatt's determinations concerning the false arrest claim might have to be reconsidered. At that time, the Court advised counsel of this possibility and invited counsel to submit any evidence that should be considered therewith. Tr. 288-29.

advantage of having two officers which could well have avoided the need for the use of force).

So what exactly happened during this interaction?  Plaintiff contends that he was on the phone with the police precinct when he heard the screeching of brakes.  Tr. 72.  He told the Precinct representative that he would have to get off the phone as he intended to video unfolding events.  *Id.*  As he began turning around, he reports that "I saw Officer Rane charging with his hand in the air."  *Id.*  He saw "something . . . long and dark" in Rane's hand and saw Rane's raised hand coming down on him.  *Id.* 73.  He felt blows to his hand and head.  *Id.* 73, 163.[9]

Padilla recalled little of substance concerning the apprehension of plaintiff, while Rane's account of these events is inconsistent and nonsensical.  Rane describes "bum-rushing" the plaintiff, a phrase Rane understands as a kind of tackle.[10]  *Id.* 278, 300.  At trial, he denied using his baton or flashlight during this maneuver, but earlier testimony seems to suggest that he used something to "take him down."  *Id.* 279-80.  Rane does admit striking the plaintiff with his baton or flashlight one or more times during the arrest, but does not recall exactly when.  *Id.* 302, 306, 309, 311.  Little justification was offered for the use of the baton, other than the plaintiff resisting being handcuffed.  *Id.* 366.  Padilla joined the struggle, sitting on the plaintiff while Rane grappled with the plaintiff.  *Id.* 368.  Padilla helped Rane handcuff the plaintiff, who was bleeding, and escort him into Rane's vehicle, where they quickly transported him to the hospital.  *Id.* 208.  They called in the arrest via radio at 4:32 a.m.  *Id.* 209.

---

[9] Plaintiff describes his cell phone – which he, inexplicably, did not preserve as evidence  (last visited June 23, 2021) as having been destroyed by a "strike," presumably by Rane.  Tr. 79.  Even though he described unsuccessful efforts to restore the data on the phone, even the physical object, or a photo of its condition, would have been an important piece of evidence.

[10] The meaning of the phrase "bum rush" – originally "give the bum's rush" – has morphed across the last century.  Originally used to describe a process of forcibly ejecting an unwelcome patron from an establishment, more recent definitions include "to hit someone from behind" or a "frontal assault."  Zimmer, Ben, "The Origins of the Term 'Bum Rush,'" *The Wall Street Journal*, August 22, 2014.

Rane vehemently denied striking the plaintiff in the face with his baton. *Id.* 366, 370.

In a refreshing burst of candor, Rane testified as follows in response to a clarifying question

from the Court:

> THE COURT: How did the plaintiff injure his face, to your knowledge?

> THE WITNESS: I did hit him with my hands.

> THE COURT: So you struck him with your hands to his face, yes?

> THE WITNESS: Yes.

*Id.* 383. Particularly in light of the troubling testimonial history of this case, defense counsel's

subsequent effort to elicit from this witness that he was unaware of the cause of the injuries to

plaintiff's face were neither helpful to nor credited by the Court. *Id.* 386-87, 390-91.

Plaintiff could not recall anything thereafter, though he reports waking up in the back

seat of a police vehicle in Nassau Medical Center's parking lot. *Id.* 74.[11] He recalled being

handcuffed to a bed, "beaten and bloodied" and claims that the officers were in the room

laughing at him. *Id.* 77. According to his recollection, in the hospital room, he kept asking

them, "What did I do?", *id.*, while Rane recalls plaintiff asking this question repeatedly in the

police car. *Id.* 378.[12]

Plaintiff sustained serious injuries, including a broken orbital socket and extensive

damage to his nose and little finger. *Id.* 81. He reports a huge lump on his head that remains,

though his medical expert arguably undermines this assertion. *Id.* 82. He credibly reports sleep

problems from the attack, *id.* 83-84, including recurring nightmares about being pursued by

defendant Rane. *Id.* 85. One condition, documented as a phantom smell by the medical expert,

---

[11] Despite plaintiff's testimony that he had been "knocked out," this most likely was not the case, as the officers were able to get him into a police SUV which, given plaintiff's size, seems unlikely if he were unconscious.
[12] Wherever it was asked, it was a good question.

lasted a number of years.  *Id.* 92.  He similarly reported anxiety, stress and confidence problems

which required therapy.  *Id.* 97-99.

*The Department's Policy and Practices Concerning Force*

It is a best practice among police professionals to de-escalate volatile situations and

avoid and/or minimize the use of force where practicable.  *Id.* 412, 434-35 (law enforcement

expert testifying about de-escalation generally and as specifically applied in Nassau County

Police Policies).  "In a policing context, de-escalation aims to decrease the use of force against

civilians by teaching officers techniques to slow things down and use time, space and

communication to find an alternative."  McKenna, S., "Police Violence Calls for Measures

beyond De-escalation Training," *Scientific American*, June 17, 2020.  Such strategies are well

documented in the policies, training and practices prescribed by the Nassau County Police

Department, as demonstrated by a number of exhibits received at trial.  *Id.*  Among these

exhibits was a Lesson Plan from the Nassau County Police Academy concerning the use of

force.  It provides, as a general matter, the following:

> Aside from the prospect of being the subject of litigation, there are other
> practical reasons why an Officer's use of force must be proper. The law
> demands it; Police Officers have a sworn duty to safeguard the rights of the
> individual. This duty prohibits Officers from abridging the rights of a person
> even under the most stressful and dangerous conditions. Therefore, the use of
> force must be REASONABLE and NECESSARY as it relates to the
> circumstances, and LAWFUL.

Ex. 9 (capitalization as original).  Another policy document outlines the "Progression of Force"

to be utilized by members of the Department, outlining a continuum of progressive control

measures as follows: Verbal Direction, Physical Direction (ranging from physical contact to

restraint holds), Non-Lethal Force (specifically referring to a type of mace), Impact Weapon

(baton) and Firearm.  Ex. 12.  While it is clear that this progression is not always linear, in this

13

case it is notable that Rane proceeded almost instantly to more significant measures without justification or reasoned explanation.

Because the plaintiff posed no threat, the only possible justification for the use of force in this case was force required to effect an arrest. Department policies, as well as the law, render the use of force permissible only when necessary to effect a legitimate arrest. *See* Ex. 27 (NCPD policy providing that "force is authorized when reasonably believed to be necessary to effect a lawful arrest"). As defendants had no valid basis to arrest the defendant, the force used by both officers was, by definition, inappropriate and excessive.

That these officers deviated so dramatically from departmental policies demonstrates that their actions in this matter were *ultra vires*, well outside the directives and instructions of the Department. Any question in this regard can be put to rest by the lengths to which these defendants went to avoid supervisory involvement – indeed, the cancellation of the supervisor, the effort to route all 911 calls directly to Rane and, ultimately, the attack on the plaintiff, all appear to have been motivated primarily by a desire to terminate his persistent attempts to contact a supervisor. Clearly, these officers acted in a manner contrary to the documented policies of the Department, and only for their own purposes.

## DISCUSSION

### I.    Liability

#### *Excessive Force and Assault and Battery*

The Supreme Court has held that "*all* claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard."

*Graham v. Connor*, 490 U.S. 386, 395 (1989).  Applying this standard "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.  Particularly where, as here, an arrest is not based upon probable cause, "[t]he elements of New York assault and battery and Section 1983 excessive force claims are 'substantially identical'" as the officers' conduct is not privileged in any respect. *Tardif v. City of New York*, 991 F.3d 394, 410 (2d Cir. 2021).

Based on the facts established at trial, applying this standard poses little difficulty. Plaintiff was not implicated in *any* crime, posed little or no threat to the officers, and cannot reasonably be said to have resisted or fled.  As such, the plaintiff overwhelmingly established that the officers used excessive force, not only in Rane's brutal attack upon the plaintiff, but even the force used by both officers to subdue and restrain the plaintiff. *See Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985) ("In each of these cases, the question was whether the totality of the circumstances justified a particular sort of search or seizure.").

Defendants' invocation of qualified immunity proves inapposite.  In a case such as this one, the Second Circuit has greatly simplified the analysis, reducing two elements of the test first articulated in *Saucier v. Katz*, 533 U.S. 194 (2001) to a single issue: "Whether in the particular circumstances faced by the officer, a reasonable officer would believe that the force employed was lawful." *Weather v. City of Mount Vernon*, 474 F. App'x. 821, 822 (2d Cir. 2012).  On these facts, to pose the question is to resolve it.  The officers assaulted, handcuffed, restrained and confined a citizen whom, they are now forced to admit, did nothing unlawful. Plainly, these officers are not entitled to qualified immunity.  Thus, plaintiff has established

liability on the part of the officers for § 1983 excessive force and state assault and battery.

At the same time, plaintiff has failed to demonstrate *respondeat superior* liability on the part of the County. Nothing on these facts suggests that the officers were acting in the scope of their employment. Rather, the evidence shows that they undertook actions – from preventing a supervisor from coming to the scene to filing false court documents in an effort to conceal these occurrences – to frustrate controls against this kind of conduct.

### Failure to Intervene

As Judge Spatt observed, "Section 1983 imposes liability not only on officers who use excessive force, but on fellow officers who fail to intervene when excessive force is used by a colleague in their presence." *Stratakos v. Nassau Cty.*, No. 2:15-CV-7244 (ADS)(ARL), 2019 WL 6699817, at *8 (E.D.N.Y. Dec. 9, 2019) (citing *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988) ("A law enforcement officer has an affirmative duty to intercede on behalf of a citizen whose constitutional rights are being violated in his presence by other officers.")). Counsel for defendants argue that plaintiff cannot establish Padilla's failure to intervene with respect to Rane's attack as he could not have responded quickly enough. *See id.* (noting that "for a law enforcement officer to be held liable for another officer's use of excessive force, 'there must have been a realistic opportunity [for the bystander officer] to intervene to prevent the harm from occurring'") (quoting *Rogoz v. City of Hartford*, 796 F.3d 236, 251 (2d Cir. 2015))).

However, defendants' argument misses the mark. As noted, liability for the force claims extends even to the post-attack handcuffing of the plaintiff. Thus, both Padilla and Rane are liable for failure to intervene, as both had opportunities to stem the violation of plaintiff's constitutional rights.

***The First Amendment Claim: Right to Film the Police***

The showing made linking the events of that night to an intent to violate the plaintiff's right to videorecord the police is, at best, attenuated. Several factors lead to this conclusion: the plaintiff's advanced state of intoxication, the absence of any video evidence (ultimately chargeable to plaintiff's failure to preserve the cell phone), and the powerful evidence of other motivations behind the assault (including plaintiff's calls to the precinct, demanding Rane's identification information, Rane's prior experience with civilian complaints, and a general perception that plaintiff had acted "obnoxiously"). These factors far outweigh the suggestion that the attack was intended in any significant part as an effort to chill plaintiff's first amendment right to videorecord the incident. The undersigned finds, therefore, that the plaintiff has failed to meet his burden of proof on this claim.[13]

Counsel for plaintiff urges the Court to find that the defendants acted to interfere with plaintiff's right under the First Amendment to petition for redress of grievances. One could draw an inference that defendants' actions were motivated, in some measure, by a desire to prevent plaintiff from contacting a police supervisor. However, "in order to prevail on a right to petition claim, [p]laintiff must show that his activity dealt with a matter of public concern." *Gusler v. City of Long Beach*, 823 F. Supp. 2d 98, 133 (E.D.N.Y. 2011). In these circumstances, with plaintiff nearly insensible from alcohol, and the evidence presenting shifting accounts of the subject matter of plaintiff's complaint, it cannot be said that plaintiff's activity was a matter of public concern. The Court recognizes that "simply because a person was motivated by a personal grievance does not necessarily mean she was not also speaking on

---

[13] Even assuming plaintiff were able to establish that this represented part of the motivation for the harms inflicted, any damages from such a violation would be nominal, as there was no proof that the plaintiff did or, given his impaired state, could have captured any relevant video footage.

a matter of public concern." *Giachetto v. Patchogue-Medford Union Free Sch. Dist.*, 413 F. Supp. 3d 141, 145 (E.D.N.Y. 2016). On this record, though, there is substantial ambiguity as to that which plaintiff wanted to complain about. Thus, the Court finds that plaintiff has failed to meet his burden of proof regarding this claim.[14]

### False Arrest, False Imprisonment and Malicious Prosecution

As noted, Judge Spatt previously issued an opinion finding that defendants were entitled to summary judgment on plaintiff's claims of false arrest, false imprisonment and malicious prosecution. *See Stratakos*, 2019 WL 6699817, at *11-14. That determination was based on the submission of evidence by defendants purportedly demonstrating that the officers had probable cause to effect the arrest and initiate the prosecution of plaintiff for Obstructing Government Administration and Second-Degree Assault. *Id.* at *12 (finding, based upon the submissions, that "the police had probable cause to arrest the Plaintiff for OGA"). However, at summary judgment, defendants submitted materials designed to convince the Court that the officers had probable cause because plaintiff had been, among other things, "refusing to comply with lawful directives" and "interfering with the police completing their duties at the scene." *Id.* at *2; DE 60-1 ¶ 12. The sworn testimony at trial belies these contentions and the evidence submitted on summary judgment. *See, e.g.*, Tr. 262-63 (Rane testified that plaintiff was not doing anything wrong and that he had no right to ask him to leave area). Moreover, a great deal of critical information was not made available to the Court at that juncture, including the fact that the officers coordinated their testimony at every proceeding, or that the prosecution was predicated upon an entirely fictitious charging document. Thus, the summary judgment determination could well be viewed as the result of a fraud upon the Court.

---

[14] Had plaintiff established this claim, the damages would have been nominal and/or subsumed in the sums awarded for excessive force.

Plaintiff seeks to amend the complaint to conform to the proof under Rule 15(b), as a procedural mechanism to reintroduce the counts subject to summary judgment. Defendants counter that plaintiff should not be permitted to reopen these claims, largely relying upon the finality of judgments and a failure to comply with the strict requirements of Rule 60(b). Both arguments miss the mark.

Rule 54(b) of the Federal Rules of Civil Procedure provides:

> When an action presents more than one claim for relief--whether as a claim, counterclaim, crossclaim, or third-party claim--or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay. Otherwise, *any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.*

Fed. R. Civ. P. 54(b) (emphasis added); *see Security Pac. Mortg. & Real Est. Servs., Inc. v. Herald Ctr. Ltd.*, 731 F. Supp. 605, 610 (S.D.N.Y. 1990) ("A grant of partial summary judgment is not final."). This Court made no Rule 54(b) findings concerning the entry of partial judgment, nor did any party request the same. Therefore, consistent with the Rule, that determination may be "revised" at any time, and the undersigned hereby exercises his discretion to do so. *See Acha v. Beame*, 570 F.2d 57, 63 (2d Cir. 1978) ("Whether such revision is appropriate in any given case is within the sound discretion of the trial judge."); *Modlin v. Iselin*, No. 8104, 1986 WL 202, at *1 (Del. Ch. June 5, 1986) ("Under Rule 54(b) the Court retains the power to revise an order or decision adjudicating less than all of the claims in the lawsuit. Such power is to be exercised as a matter of discretion where justice requires."). To be sure, such determinations "may not usually be changed unless there is 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error

or prevent a manifest injustice.'" *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003). But the fraudulent nature of the evidence submitted by defendants at summary judgment clearly satisfies this standard. *See Buczakowski v. 1199SEIU*, No. 518 CV 0812 (LEK)(ML), 2020 WL 2092480, at *4 (N.D.N.Y. May 1, 2020) ("[T]o uphold a clearly erroneous ruling based on a misrepresentation . . . constitutes a manifest injustice the Court must correct.").

Importantly, defendants are not unfairly prejudiced by this determination. As noted, the Court discussed the possibility of revisiting Judge Spatt's grant of partial summary judgment at the mid-point of the trial, expressly leaving the record open for any party to submit evidence on this question. Thus, the parties were well aware of these claims, submitted trial evidence relevant thereto, and argued the law in motions and post-trial briefs. Furthermore, since plaintiff argued that the wrongful arrest, detention and prosecution were integral to defendants' efforts to conceal their improper use of force, the factual matters related to the arrest and prosecution were fully explored during the examination of witnesses and are thoroughly documented in the exhibits submitted. Finally, given that defendants obtained summary judgment through the submission of documents and argument that were – at a minimum – misleading, they cannot reasonably expect to profit by such misconduct.

Based on the foregoing, Judge Spatt's order directing summary judgment as to false arrest, false imprisonment and malicious prosecution is vacated, and the Court will consider those claims in resolving this action.

To prevail on his false arrest claim, plaintiff must establish "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged."

*Stratakos*, 2019 WL 6699817, at \*11. These elements are essentially identical for false arrest claims under § 1983 and New York law, as well as for false imprisonment claims. *Id.* The proof at trial fully satisfied these elements.

As to malicious prosecution, a plaintiff must establish that "(1) the defendant initiated prosecution against her, (2) without probable cause to believe that proceeding could succeed, (3) that the proceeding was begun with malice, and (4) that the matter terminated in the Plaintiff's favor." *Id.* at \*13. At trial, plaintiff established that Rane and Padilla commenced the prosecution using falsified documents created by both defendants, that the officers coordinated their testimony at almost every turn to help bolster the effort, and that the plaintiff was exonerated in the criminal proceeding. As to the malice element, a reasonable inference can be drawn given the defendants' interest in concealing their misdeeds, including the assault on the plaintiff, from superior officers to protect their careers. Thus, plaintiff has successfully proven his claim of malicious prosecution.

## II. Damages

*Compensatory Damages – Pain & Suffering, Emotional and Economic Damages*

Given the findings of liability, the analysis turns to the question of damages.[15]

The physical injuries to plaintiff include damage to his nose, head and face, including a deviated septum; a maxillary fracture; and a persistent, though asymptomatic, lump on his head. Tr. 10-13, 21-25, 81-2; Exs. 5 & 8. One possible effect of the injury to his nose was the experience of a phantom smell for several years; while plaintiff's testimony on this issue did not fully comport with the expert medical testimony, there appears to be at least some basis for

---

[15] Counsel for plaintiff, purporting to "assist the Court in determining a fair award in this case," cites the Court principally to one case involving a $2.5 million verdict that is factually and legally distinguishable. DE 98 at 41. Defendants fare no better, arguing, without support, that plaintiff is unentitled to either compensatory or punitive damages. DE 98-1 at 46-51.

this claim.  Tr. 12, 92-94.  These injuries, which resulted in sleep difficulties from physical discomfort, appear to have arisen from defendants' use of excessive force.  Taken together, these injuries are significant, though not grave, and can be best characterized as semi-permanent.  The physical injuries also include being handcuffed and unjustly confined for a night.

Then there are emotional damages.  As the plaintiff did not provide any specific medical testimony or records relating to psychological aftereffects, this matter must be viewed as a Tier 1 or "garden variety" case.  At the same time, the plaintiff testified credibly to certain emotional symptoms, including quite specific nightmares relating to this incident.  Tr. 84-86.  He also testified to effects on sleep, mood, memory and concentration.  Tr. 65, 84-87.  The memory and concentration issues do not derive from neurological injury but may be related to sleep loss.  Ex. 6.  These emotional damages are further complicated by the prospect of facing months of court appearances and the possibility of being falsely convicted of several offenses, including felony assault of a police officer.

Taking all of these elements together, the Court finds that plaintiff is entitled to a compensatory award of $100,000 representing pain and suffering and emotional injury arising from the assault, arrest and prosecution of plaintiff.  In setting this figure, the undersigned notes that the Second Circuit reviewed a somewhat comparable situation in *Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 206-08 (2d Cir. 2014) (reducing a $200,000 compensatory award in a false arrest/malicious prosecution case to $100,000).  The plaintiff in *Stampf* suffered some similar circumstances as plaintiff herein, including stress, anxiety and sleep deprivation while facing unfounded arrest and criminal prosecution.  Notably, the Circuit observed that "$100,000 appears to reflect the upper end of the range of awards in comparable cases," while

surveying a number of comparable cases with far lower awards. *Id.* at 207. Due to a number of

factors, the plaintiff in *Stampf* withstood "greater than 'garden variety' emotional distress,"

which is not the case here, but did not sustain physical injuries. Therefore, on balance, the

Court finds that the $100,000 would adequately compensate plaintiff for the injuries sustained.

As to economic damages, plaintiff has identified only one ascertainable source of

economic loss: the costs of hiring an attorney to represent him against the trumped-up charges.

That figure is $15,000, which is documented and consistent with the Court's experience with

costs of criminal litigation. *See* DE 98 at 59 and attachment thereto.

Therefore, the Court awards compensatory damages in the aggregate amount of

$115,000.

*Punitive Damages*

As the Second Circuit has observed:

Punitive damages are available in a § 1983 action "when the defendant's conduct
is shown to be motivated by evil motive or intent, or when it involves reckless or
callous indifference to the federally protected rights of others."

*Lee v. Edwards*, 101 F.3d 805, 808 (2d Cir. 1996) (quoting *Smith v. Wade*, 461 U.S. 30, 56

(1983)). The facts of this case, as detailed in this decision, clearly warrant consideration of

punitive damages.

In *Anderson v. Aparicio*, 25 F. Supp. 3d 303 (E.D.N.Y. 2014), *aff'd and remanded sub

nom. Anderson v. Cty. of Suffolk*, 621 F. App'x 54 (2d Cir. 2015), this Court reviewed a jury

award following an excessive force trial. The jury awarded compensatory damages of $20,000

and punitive damages of $75,000 against a jail guard. The physical injuries inflicted there were

not unlike those at issue in the instant case. *See id.* at 311 ("Plaintiff testified that Aparicio and

other deputies punched him in the face and on the back of the head repeatedly and slammed

him onto the ground, causing injuries . . . Plaintiff produced photographs taken later that day documenting significant facial injuries, as well as a raft of medical documents recording at least some of the additional injuries he described.").  This case is similar in some respects, in that it involves unprovoked assault by a law enforcement officer, though this case provides additional concerns arising from the extensive concealment and coverup of that assault through fabricated prosecution and repeated false testimony.

As noted in *Anderson*, in examining a punitive award (or in this case, crafting one), the Court must consider the factors set forth in *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996), such that the Court will consider the reprehensibility of the defendants' acts, the ratio to compensatory damages, and the penalties imposed for comparable misconduct.  As to reprehensibility, defendants' conduct was "plainly inexcusable, a disturbing demonstration of unprovoked violence by a law enforcement officer," *Anderson*, 25 F. Supp. 3d at 311, aggravated by wanton abuse of the criminal justice system in a misguided attempt to conceal these acts.

As to ratio, punitive damages fixed as a multiple of compensatory damages is well supported in the law.  *Id.* at 303 ("[T]he notion of punitive damages measured as a small multiple of compensatory damages is supported by centuries of jurisprudence and legislative pronouncements") (citing *Gore*, 517 U.S. at 580–81) ("Scholars have identified a number of early English statutes authorizing the award of multiple damages for particular wrongs [including] 65 different enactments during the period between 1275 and 1753 [that] provided for double, treble, or quadruple damages.")).

Regarding penalties for comparable misconduct, two guideposts prove helpful.  In *Anderson*, the undersigned collected a series of comparable excessive force punitive awards by

juries, which were later revised by the Second Circuit: though the jury awards ranged between $150,000 to $1.2 million, the Court of Appeals reduced most of them, some substantially, lowering that range to $75,000-$185,000. *Anderson*, 25 F. Supp. 3d at 312. And federal criminal law provides a useful framework: Section 242 of Title 18, United States Code imposes a fine of up to $250,000 (and up to ten years in jail) for criminal violations akin to a § 1983 excessive force claim.

In this case, while the conduct of both officers was reprehensible, the evidence suggests that Rane was the initial aggressor, inflicting most of the physical harm and taking on an aggravating role. At the same time, Padilla remains highly culpable, having sworn to a fictitious charging document. Both defendants demonstrated contempt for the truth, having doctored their testimony repeatedly, if unskillfully, before this and other tribunals. As such, the Court imposes punitive damages of $75,000 as to Rane and $40,000 as to Padilla. These individual sums are well within the range established in other excessive force cases, including those cited above, and significantly below the potential fine for violations of 18 U.S.C. § 242. The aggregate amount, $115,000, equals the amount of compensatory damages awarded, and is therefore consistent with the practice of awarding double damages.

### *Payment of the Punitive Awards*

The Court notes that these sums are designed to serve the purposes of punishment for the outrageous conduct described herein. These sums are allocated specifically as punitive awards lodged against the officers in their individual capacities, as this Court has found that the officers were not acting in furtherance of the interests of the County. Whether the officers or the County will pay these award remains an open question. It is the law in New York State that, generally speaking, municipalities are prohibited from indemnifying their employees

against punitive damages. N.Y. Pub. Off. Law § 18(4)(c) (McKinney) ("Nothing in this subdivision shall authorize a public entity to indemnify or save harmless an employee with respect to punitive or exemplary damages . . . ."). There is a special, and perhaps, surprising, statutory provision governing such awards against Nassau County Police Department employees which provides:

> Notwithstanding the provisions of any other law, code or charter, *the county of Nassau shall* provide for the defense of any civil action or proceeding brought against a duly appointed police officer of the Nassau county police department and *shall indemnify and save harmless such police officer from any judgment of a court of competent jurisdiction whenever such action, proceeding or judgment is for damages, including punitive or exemplary damages, arising out of a negligent act or other tort of such police officer committed while in the proper discharge of his duties and within the scope of his employment.* Such proper discharge and scope shall be determined by a majority vote of a panel consisting of one member appointed by the Nassau county board of supervisors, one member appointed by the Nassau county executive, and the third member being the Nassau county police commissioner or a deputy police commissioner.

N.Y. Gen. Mun. Law § 50-l (McKinney) (emphasis added). For avoidance of doubt, the Court finds that the punitive awards here emanate from conduct that does not fall within the category of "negligent acts," and that the defendant officers did not commit these acts "while in the proper discharge of [their] duties and within the scope of [their] employment." Of course, the statutorily-created panel may make a different determination. At the same time, whether the officers are personally liable may affect collection of the judgment, and plaintiff might seek additional remedies to ensure that the purposes of the punitive award are met. As such, the Court suggests that counsel for defendants file a letter on ECF with the results of the panel's decision within 30 days of the determination being rendered.

## CONCLUSION

Based on the foregoing, the Clerk shall enter judgment in favor of plaintiff in the total

amount of $230,000, representing $115,000 in compensatory damages (for which defendants are jointly and severally liable), $75,000 in punitive damages against defendant Rane and $45,000 in damages against defendant Padilla.

Plaintiff's counsel shall file, within 14 days, an application for fees and costs; any response by defendants will be filed ten days thereafter.

It is requested that counsel for defendants file a letter via ECF advising this Court and plaintiff's counsel of the determination made concerning indemnification within 30 days of such decision.

**SO ORDERED.**

Dated: Central Islip, New York
June 24, 2021

/s/ Gary R. Brown
GARY R. BROWN
United States District Judge